NO. 12-57048

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

FOX BROADCASTING COMPANY, INC., TWENTIETH CENTURY FOX FILM CORP., AND FOX TELEVISION HOLDINGS,

PLAINTIFFS-APPELLANTS,

v.

DISH NETWORK L.L.C. AND DISH NETWORK CORPORATION,

DEFENDANTS-APPELLEES.

On Appeal from the United States District Court for the Central District of California; Case No. 12-cv-04529-DMG (SHx)
Honorable Dolly M. Gee District Judge

## BRIEF AMICI CURIAE OF ELECTRONIC FRONTIER FOUNDATION, PUBLIC KNOWLEDGE, AND ORGANIZATION FOR TRANSFORMATIVE WORKS IN SUPPORT OF APPELLEES

Mitchell L. Stoltz (NY SBN 4466272)
Corynne McSherry (CA SBN 221504)
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
Telephone: (415) 436-9333
Facsimile: (415) 436-9993
mitch@eff.org
*Counsel for Amici Curiae*

*On the brief:*
John Bergmayer
Senior Staff Attorney
PUBLIC KNOWLEDGE
1818 N Street, NW, Suite 410
Washington, DC 20036
Telephone: (202) 861-0020
john@publicknowledge.org

*On the brief:*
Betsy Rosenblatt
ORGANIZATION FOR TRANSFORMATIVE WORKS
2576 Broadway, Suite119
New York, NY 10025
betsy_rosenblatt@post.harvard.edu

**DISCLOSURE OF CORPORATE AFFILIATIONS AND
OTHER ENTITIES WITH A DIRECT FINANCIAL INTEREST IN
LITIGATION**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Amici

Curiae Electronic Frontier Foundation, Public Knowledge, and Organization for

Transformative Works (collectively, "Amici") state that none of them has a parent

corporation and that no publicly held corporation owns 10% or more of the stock

of any of them.


Dated: January 24, 2013                      _____/s/ Mitchell L. Stoltz_____
                                                     Mitchell L. Stoltz
                                                     *Counsel for Amici Curiae*

## TABLE OF CONTENTS

STATEMENT OF INTEREST ............................................................... 1

INTRODUCTION ............................................................................ 3

I.   THE DISTRICT COURT'S VOLITIONAL ACT ANALYSIS IS
     CORRECT AND COMPORTS WITH COPYRIGHT'S PURPOSES .......... 4

     A.   The Volitional Conduct Requirement Is Grounded in Statutory and
          Common Law ................................................................... 5

     B.   The Volitional Conduct Requirement Promotes the Progress of
          Science ........................................................................... 8

     C.   The District Court Correctly Applied the Volitional Conduct
          Requirement in Finding that Dish Users Make the PTAT Copies ..... 11

II.  FOX IS NOT ENTITLED TO A PRELIMINARY INJUNCTION ............. 13

     A.   The Hopper Allows Viewers to Time-Shift Programming, a Fair
          Use ................................................................................ 13

          1.   Fox's Viewers Do Not Infringe Copyright When They Skip
               Commercials, Which Means That Dish Cannot Be
               Secondarily Liable. ............................................... 14

               a.   The Character of the Use is Private and
                    Noncommercial. ........................................ 15

               b.   Broadcast Works Are Public in Nature. ........... 15

               c.    Time-Shifting Requires the Whole Work to Be
                    Copied ................................................... 16

               d.   There Is No Effect on Any Likely Markets. ....... 17

          2.   The Hopper's Time-Shifting Does Not Allow Users to Create
               "Libraries." ....................................................... 20

3.    The Hopper's Commercial-Skipping Feature Does Not
      Implicate Copyright and Does Not Make Its Time-Shifting
      Unlawful. ................................................................................... 22

B.    Dish's Intermediate Copying is a Fair Use. ...................................... 23

C.    Any Harms That Fox Alleges Are Quantifiable, and Do Not
      Support a Preliminary Injunction. ...................................................... 25

CONCLUSION ................................................................................................... 28

# TABLE OF AUTHORITIES

## Federal Cases

*A.V. ex rel. Vanderhye v. iParadigms, LLC,*
 562 F.3d 630 (4th Cir. 2009) ...................................................................... 24

*A&M Records v. Napster, Inc.,*
 239 F.3d 1004 (9th Cir. 2001) .................................................................... 14

*Am. Geophysical Union v. Texaco, Inc.,*
 60 F.3d 913 (2d Cir. 1994) ......................................................................... 18

*Apple Inc. and NeXT Software, Inc. v. Motorola Inc. and Motorola Mobility, Inc.,*
 Federal Circuit Case Nos. 2012-1548, 2012-1549 (filed Dec. 4, 2012) ....... 27

*Authors Guild, Inc. v. HathiTrust,*
 2012 U.S. Dist. LEXIS 146169 (S.D.N.Y. Oct. 10, 2012) .......................... 19

*Baxter v. MCA, Inc.,*
 812 F.2d 421 (9th Cir. 1987) ........................................................................ 5

*Baylor v. United States,*
 407 A.2d 664 (D.C. 1979) ............................................................................. 6

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
 448 F.3d 605 (2d Cir. 2006) ....................................................................... 19

*Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief and Dev.,*
 291 F.3d 1000 (7th Cir. 2002) ....................................................................... 6

*Campbell v. Acuff-Rose Music, Inc.,*
 510 U.S. 569 (1994) .............................................................................. 16, 24

*Caribbean Marine Services Co., Inc. v. Baldrige,*
 844 F.2d 668 (9th Cir. 1988) ....................................................................... 25

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.,*
 536 F.3d 121 (2d Cir. 2008) .............................................................. 7, 11, 12

iv

*CoStar Grp., Inc. v. LoopNet, Inc.*,
  373 F.3d 544 (4th Cir. 2004) .......................................................................... 6

*Flava Works Inc. v. Gunter*,
  689 F.3d 754 (7th Cir. 2012) .......................................................................... 8

*Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.*,
  654 F.3d 989 (9th Cir. 2011) ........................................................................ 25

*Harper & Row Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985) ....................................................................... 15, 17, 23

*Kalem Co. v. Harper Brothers*,
  222 U.S. 55 (1911) .......................................................................................... 7

*Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*,
  964 F.2d 965 (9th Cir. 1992) ........................................................................ 15

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  387 F.3d 522 (6th Cir. 2004) ........................................................................ 24

*Martinez v. California*,
  444 U.S. 277 (1980) ........................................................................................ 6

*Newport-Mesa Unified Sch. Dist. v. State of Calif. Dep't of Educ.*,
  371 F.Supp. 2d 1170 (C.D. Cal. 2005) ........................................................ 24

*Office of Commc'n of United Church of Christ v. FCC*,
  359 F.2d 994 (D.C. Cir. 1966) ...................................................................... 16

*Perfect 10, Inc. v. Google, Inc.*,
  653 F.3d 976 (9th Cir. 2011) ........................................................................ 26

*Perfect 10, Inc., v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) ......................................................... 14, 21, 24

*Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys. Inc.*,
  180 F.3d 1072 (9th Cir. 1999) ...................................................................... 15

*Religious Tech. Ctr. v. Netcom On-Line Commc'n. Svcs., Inc.*,
  907 F.Supp. 1361 (N.D. Ca. 1995) ........................................................ 5, 6, 8

*Salinger v. Colting*,
 607 F.3d 68 (2d Cir. 2010) ...................................................... 25, 26

*Sarl Louis Feraud Int'l v. Viewfinder, Inc.*,
 627 F.Supp. 2d 123 (S.D.N.Y. 2008) ...................................... 19, 20

*Sega Enter. Ltd. v. Accolade, Inc.*,
 977 F.2d 1510 (9th Cir. 1992) ...................................................... 25

*Sony Computer Entm't v. Connectix Corp.*,
 203 F.3d 596 (9th Cir. 2000) ........................................................ 25

*Sony Corporation of Am., Inc. v. Universal City Studios, Inc.*,
 464 U.S. 417 (1984) ..........................................................*passim*

*Universal City Studios, Inc. v. Sony Corp. of Am.*,
 480 F.Supp. 429 (C.D. Cal 1979) ................................................. 16

## Federal Statutes

17 U.S.C. § 107 ............................................................... 15, 17, 21

17 U.S.C. § 501 ......................................................................... 5

17 U.S.C. § 512 ......................................................................... 8

## Constitutional Provisions

U.S. Const. amend. 1 ................................................................ 16

U.S. Const. art. 1 ...................................................................... 9

## Legislative Materials

H.R. Rep. No. 94-1476 (1976) ................................................... 21

S. Rpt. 105-190 (1998) ............................................................... 8

U.S. Code Cong. & Admin. News 1976 ...................................... 21

## Other Authorities

Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, *The Law of Torts* (2nd ed 2011)................................................................................................... 6

Cyrus Farivar, *Fox, NBCUniversal Sue Dish over Ad-Skipping DVR Service*, Ars Technica (May 24, 2012) .................................................................... 22

United States Department of Justice and United States Patent & Trademark Office, Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/Rand Commitments (Jan. 8, 2013) .......................................... 27

## STATEMENT OF INTEREST

This brief is filed pursuant to Federal Rule of Appellate Procedure 29(a) with the consent of all parties.

The Electronic Frontier Foundation ("EFF") is a member-supported, nonprofit public interest organization dedicated to protecting civil liberties and free expression in the digital world. Founded in 1990, EFF represents more than 21,000 contributing members. On behalf of its members, EFF promotes the sound development of copyright law as a balanced legal regime that fosters creativity and innovation while respecting individual rights and liberties. EFF's interest with respect to copyright law reaches beyond specific industry sectors and technologies to promote well-informed copyright jurisprudence. In this role, EFF has contributed its expertise to many cases applying copyright law to new technologies, as amicus curiae, as party counsel, and as court-appointed attorneys *ad litem*.

Public Knowledge ("PK") files this brief to protect the fair use rights of television users, and to argue for legal principles that allow new business models to succeed, and new technologies to reach the market. PK is a non-profit public interest 501(c)(3) corporation, and its primary mission is to promote technological innovation, protect the legal rights of all users of copyrighted works, and ensure that emerging copyright and telecommunications policies serve the public interest.

Applying its years of expertise in these areas, PK frequently files amicus briefs at the district and appellate level in cases that raise novel issues at the intersection of media, copyright, and telecommunications law.

Organization for Transformative Works ("OTW") is a 501(c)(3) organization that represents the interests of media fans and other noncommercial creators before the Copyright Office and has filed amicus briefs on significant issues of intellectual property law. The popular fanwork genre of noncommercial videos ("vids") uses clips from television shows or film, reworking them in a way that comments on or critiques the original. The Copyright Office has held that substantial numbers of vids constitute fair uses. But the creation of fan vids requires intermediate digital copying and processing in order to produce the transformative final product. OTW thus believes that intermediate copying performed to facilitate fair use constitutes fair use.

Pursuant to Federal Rule of Appellate Procedure 29(c)(5), no one, except for undersigned counsel, has authored the brief in whole or in part, or contributed money towards the preparation of this brief.

## INTRODUCTION

For consumers, having control over when, where, and how to watch TV shows broadcast on the public airwaves is valuable. The Hopper digital video recorder created by the Dish appellees creates value for their customers by enabling this control, including avoiding commercials, with more ease and intuitiveness than prior generations of video recorders. The fundamental question in this case is, to whom does the Copyright Act assign that value – to the customer, or to copyright holders like the Fox appellants?

Supreme Court precedent answers that question. TV watchers do not infringe when they record a program for later viewing, nor when they skip commercials while playing back the recording. And the makers of technology that empowers customers to control their TV-watching in these ways are not liable in their customers' place.

Hoping to avoid that clear precedent, and subsequent holdings that clarify that the liability analysis must attend to who, if anyone, performs the volitional act of copying, Fox advances a ranges of theories that, if adopted, would not only harm Dish and its customers, but undermine the fundamental copyright balance and, as a result, the public interest in innovation. Both the volitional conduct requirement and strong fair use protections help ensure that technology makers can develop and offer new tools and services without fear of crippling liability where,

as here, those tools and services are capable of substantial non-infringing uses and the provider does not perform the additional actions that might subject it to secondary liability.

Amici urge the Court to protect the public interest and affirm the majority the district court's conclusion. However, for the reasons set forth below, we also urge the Court to reject the district court's suggestion that Dish's intermediate copying may not be fair.

## I.   THE DISTRICT COURT'S VOLITIONAL ACT ANALYSIS IS CORRECT AND COMPORTS WITH COPYRIGHT'S PURPOSES.

The cases addressing copyright's volitional conduct requirement draw a pragmatic liability boundary between the activities of tool *makers* and those of tool *users*. That boundary is grounded in the words of the Copyright Act, clear case law, and traditional tort principles. It is also sound policy, consistent with copyright law's constitutional purpose: to promote the progress of science. It directs courts to evaluate the relationships between technology providers and users, and their respective activities, and decline to hold the former directly liable for the conduct of the latter in most circumstances. Any other approach would retard innovation, for toolmakers would be forced to police every use of their technologies – or not allow their use at all.

The decision below reflects the prevailing, commonsense rule. After careful analysis of the factual record, the court concluded that the TV viewer, not Dish,

makes the "PTAT copies," and that Dish's liability, if any, must be based on its knowing contribution to alleged infringement by individuals, subject to individuals' fair use defenses. In keeping with sound precedent and policy, Amici urge the Court to affirm the district court's correct application of the volitional conduct requirement.

### A.    The Volitional Conduct Requirement Is Grounded in Statutory and Common Law.

Fox does its best to characterize the volitional act requirement as a "loophole." Br. of Plaintiffs-Appellants 24 ("Fox Br."). In fact, the requirement reflects the essence of copyright liability principles and the overarching thesis that should inform any liability analysis: who is the actor?

The Copyright Act expressly requires an affirmative act of copying as a prerequisite for direct infringement liability. The Act defines infringement as "the unauthorized exercise of one of the exclusive rights of the copyright holder delineated in section 106." 17 U.S.C. § 501. With regard to the reproduction right, infringement requires "'copying' of protectable expression by the defendant." *Religious Tech. Ctr. v. Netcom On-Line Commc'n. Svcs., Inc.*, 907 F. Supp. 1361, 1366-67 (N.D. Ca. 1995) (quoting *Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir. 1987)). Thus, for example, in *Religious Tech. Ctr. v. Netcom On-Line Commc'n. Svcs.*, the court held that "installing and maintaining a system" that makes copies at the command of another does not amount to direct infringement absent a volitional

5

act of copying. *Id.* at 1367; *see also CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 556 (4th Cir. 2004) (Internet service's "perfunctory gatekeeping process" does not create direct infringement liability).

The volitional act requirement for direct infringement derives in turn from well-established principles of legal causation. In nearly every area of law, including federal statutory law, the "so-called proximate cause issue is not about causation at all but about the appropriate scope of legal responsibility." Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, *The Law of Torts* § 198 (2nd ed 2011) ("Dobbs"); *see also Martinez v. California*, 444 U.S. 277, 285 (1980) (in civil rights case, holding that officers whose actions were remote from the injury suffered could not be held liable); *Boim v. Quranic Literacy Inst. & Holy Land Found. for Relief and Dev.*, 291 F.3d 1000, 1010 (7th Cir. 2002) (in civil damages action under antiterrorism statute, tort principles limit the universe of directly liable parties); *Baylor v. United States*, 407 A.2d 664, 670 (D.C. 1979) (applying tort principles of legal causation in a homicide case). Liability limitations "reflect the ideas of justice as well as practicality. In particular, the rules of proximate cause or scope of liability attempt to limit liability to the reasons for imposing liability in the first place." Dobbs § 199.

While direct liability was not at issue in the case, the Supreme Court's analysis in *Sony Corporation of Am., Inc. v. Universal City Studios, Inc.*, 464 U.S.

6

417 (1984), reflects the same appreciation of the importance of identifying who, if anyone, is actually doing the allegedly infringing act. In that case, a copyright owner sought to hold a toolmaker liable because the tool it produced could be used to infringe. The Court rejected the claim because (as discussed in greater detail *infra* at II.A) the tool could also be used to engage in noninfringing fair uses. The Court compared the facts in *Sony* to those of *Kalem Co. v. Harper Brothers*, 222 U.S. 55 (1911), in which the defendant has personally sold an unauthorized copy of a film to distributor, and then advertised the unauthorized performance of that work. Thus, the Court stressed, the defendant in *Kalem* did not merely "provide the 'means' to accomplish an infringing activity . . . [he] supplied the work itself." *Sony*, 464 U.S. at 436. In other words, the defendant engaged in volitional conduct closely and directly tied to an infringing public performance. Sony, by contrast, had merely provided the means by which users could engage in both infringing and noninfringing activities.

Thus the Supreme Court, at least two courts of appeals, and the district court in this case have emphasized the importance of tying the liability analysis to the actor "whose conduct has been so significant and important a cause that [he or she] should be legally responsible." Order at 18, citing *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 132 (2d Cir. 2008) (hereinafter *Cablevision*); *Sony*, 464 U.S. at 435 ("vicarious liability is imposed in virtually all areas of the

7

law, and the concept of contributory infringement is merely a species of the broader problem of identifying the circumstances in which it is just to hold one individual accountable for the actions of another."); *Flava Works Inc. v. Gunter*, 689 F.3d 754, 760 (7th Cir. 2012) (addressing "remoteness of injury from an alleged infringement" of copyright as "a matter of general tort principles.").

Congress also has noted and approved the use of these judge-made limits on liability in copyright cases. Considering in the late 1990s how to adapt copyright law for the Internet age, the Senate Judiciary Committee acknowledged that the *Netcom* court "approached the issue" of intermediary liability using "contributory and vicarious liability doctrines." S. Rpt. 105-190 at 19 & n.20 (1998). The Committee expressly "decided to leave current law in its evolving state" rather than overrule the holding of *Netcom*. *Id.*; *see* 17 U.S.C. § 512(l) (preserving judge-made intermediary liability).

The Fox Appellants argue that the "most significant cause" standard does not apply to copyright law. Fox Br. 22. Fox is incorrect. This standard applies to nearly all tort-like statutory causes of action, and copyright is no exception.

## B. The Volitional Conduct Requirement Promotes the Progress of Science.

Another thread running through the cases applying copyright to new technology is the importance of minimizing copyright law's interference with commerce and innovation. This is grounded in copyright's constitutional purpose:

8

to "Promote the Progress of Science and useful Arts" in parallel with patent law. U.S. Const. art. 1, § 8. The Supreme Court warned against granting copyright holders "control over an article of commerce that is not the subject of copyright protection." *Sony*, 464 U.S. at 421.

The volitional conduct standard serves this very purpose: by keeping the tool-user front and center, it helps ensure that tools are not adjudged illegal without considering the role of the user, and the defenses that might protect those her actions. Such attention is crucial if copyright is not to impede innovation. Many tasks were once performed on VCRs, personal computers, and other self-contained personal devices that were unquestionably under the user's control. This included recording and time-shifting of TV programs, and also word processing, video games, and many personal computing tasks. Today, these tasks are increasingly performed by a combination of personal devices and centralized equipment, acting together over a communications medium such as the Internet or a cable network. This has many advantages: it allows for constant improvement of the product in situ, including fixing security flaws or other dangerous conditions immediately. It saves energy, materials, and manufacturing costs by consolidating equipment at a central location.

However, as with any attempt to apply old law to new technology, this shift creates analytical complexity. Functions that were once handled by products in the

home are now carried out, at least in part, on equipment that remains under the physical control of the toolmaker, or for which the toolmaker can modify the software remotely. The basic functions of a device and the parameters under which it operates can change over time; the toolmaker can add or remove features without having to sell a new product. The relationship between toolmaker and user has also become more complex; no longer a one-time transaction of buyer and seller but an ongoing, subscription-based relationship.

Nonetheless, at the end of the day the user still makes decisions about where and how to copy – she still engages in the volitional conduct that instigates copying. Technology remains a tool that serves the interests of its user. Just as a ladder extends a person's physical reach, a device that automates previously "manual" functions such as controlling the time, place, and format of a video playback is a tool by which a person extends her ability to act in the world. The volitional act requirement ensures that her actions, and interests, are not omitted from the liability equation. That, in turn, ensures that toolmakers, too, may consider those actions as they assess their potential liability in the event that the technology they offer is used for unauthorized as well as authorized purposes.

To be clear, deciding whether a technology provider should be judged under direct or secondary liability regimes does not in itself determine whether the provider is liable. Fox's argument that the volitional act requirement "creat[es] a

10

loophole for infringers to exploit copyrighted works for profit" is thus incorrect. Fox Br. 24.[1] A technology provider who knowingly, materially contributes to customers' infringement can be found liable, but only after due consideration of whether customers are in fact infringing, and the nature and degree of the technology provider's contribution. These are the very issues that, per the Supreme Court's *Sony* decision, must be considered in cases concerning the copyright liability of a recording technology. Importing questions of a technology provider's "control over," "encouragement" of, and "participation" in customer infringement into the direct infringement regime, rather than considering them in the secondary liability context as the *Sony* court did, does not close a "loophole." *Id.* It simply attempts to paint the tool user out of the picture – and her valid fair use defenses as well.

### C.    The District Court Correctly Applied the Volitional Conduct Requirement in Finding that Dish Users Make the PTAT Copies.

In their holdings on technology providers' lack of volitional conduct, the Second Circuit in *Cablevision*, and the district court in this case, applied the principles of legal causation that apply in nearly all areas of law. The rule applied by these courts is not, as Fox claims, that "button-pressing" determines the party directly liable for alleged infringement. Fox Br. 25-26. In fact, both the

---

[1] Fox's statement also assumes what Fox must prove, *i.e.*, that Dish and similarly situated technology providers and their customers are "infringers."

*Cablevision* opinion and the district court's order in this case denied creating such a categorical rule. *Cablevision*, 536 F.3d at 133 ("We need not decide today whether one's contribution to the creation of an infringing copy may be so great that it warrants holding that party directly liable for the infringement, even though another party has actually made the copy."); Order 16-19 (analyzing Dish's "degree of discretion over the copying process").

Rather, the most important factor in both decisions is the distinction between *doing the copying* and *establishing the parameters under which the device makes copies*. The Second Circuit held that having "control over what programs are made available on individual channels or when those programs will air" is categorically different from offering customers the ability to record channels as they are broadcast or cablecast. *Cablevision*, 536 F.3d at 132. Likewise, the district court in this case found that Dish "defines some of the parameters of copying for time-shifting purposes" – the beginning and end times of the prime-time programming block, the channels that can be recorded, and the length of time that copies are saved. Order 16-19. The court held that setting these parameters of copying is distinct from "doing" the copying.

This is a sound distinction, because every maker of a recording device or service sets parameters inherent in the design of the device or service. The videocassette recorder at issue in *Sony* could record only from the set of channels

that its tuner could resolve, and only within the maximum time allowed by its videotape format. These parameters are the equivalent of those set by Cablevision and Dish, such as limiting the number of days that PTAT recordings are saved. In each case, the broadcast and cable networks (the plaintiffs) decide what programs will air, and when. The recording device simply gives the viewer more control over when and how to make personal use of those programs.

The district court's finding that Dish does not make the PTAT copies was faithful to both Supreme Court precedent and the fundamental purposes of copyright.

## II.     FOX IS NOT ENTITLED TO A PRELIMINARY INJUNCTION.

Fox is not entitled to a preliminary injunction because it has not shown (1) that either time-shifting or Dish's intermediate copying are infringing; or (2) irreparable harm.

### A.     The Hopper Allows Viewers to Time-Shift Programming, a Fair Use.

Time-shifting is a fair use, and the district court correctly found that when Fox's viewers use their Hopper devices to time-shift programming, they do not infringe. *Sony*, 417 U.S. at 448-456. Fox's attempt to avoid clear Supreme Court precedent by insisting that the Hopper's time-shifting is not "real" time-shifting, but some new thing called "PTAT copying," fails. Fox Br. 12-14. While the

13

Hopper is certainly more advanced than VCRs of the late 1970s, and more convenient to use, it is not legally distinguishable from those technologies.

Contrary to Fox's allegation, the district court did not "fail[] to conduct a fair use analysis," Fox Br. 43, with respect to Hopper users. In fact, the court reviewed the record and saw no evidence to distinguish the Hopper from other time-shifting, a classic fair use under *Sony*. The court did not commit reversible error by failing to walk through *Sony*'s analysis. Simply by demonstrating that the Hopper is used for time-shifting, Dish met any burden it might have.[2]

### 1.    Fox's Viewers Do Not Infringe Copyright when They Skip Commercials, Which Means that Dish Cannot Be Secondarily Liable.

For Dish to be liable as a secondary infringer, there must first be a direct infringer. *Perfect 10, Inc., v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007); *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1013 n.2 (9th Cir. 2001). But the only direct copying at issue with respect to the "PTAT copies" is recording programming in the privacy of one's home for time-shifting (regardless of whether one skips commercials). That copying is a noninfringing fair use.

---

[2] As a matter of procedure, fair use is structured like an affirmative defense. *See Campbell v. Acuff-Rose Music*, Inc., 510 U.S. 569, 590 (1994). This means that the defendant must prove her fair use case. However, fair use is not an "excuse," or some kind of allowable infringement. Rather, Congress was clear that a fair use "is not an infringement of copyright." 17 U.S.C. § 107. This does not constitute a diminishment of copyright's exclusive rights, because such rights are "[s]ubject to sections 107 through 122" in the first place. 17 U.S.C. § 106.

### a.    *The Character of the Use is Private and Noncommercial.*

The character of the use here, per 17 U.S.C. § 107(1), is the same as it was in *Sony*: "private, noncommercial time-shifting in the home." *Sony*, 464 U.S. at 442. Since then, courts have consistently held that a use of copyrighted material that implicates a Section 106 right "for private home enjoyment must be characterized as a non-commercial, nonprofit activity," *Lewis Galoob Toys, Inc. v. Nintendo of Am., Inc.*, 964 F.2d 965, 970 (9th Cir. 1992), and have described similar uses, such as space-shifting, as "paradigmatic noncommercial personal use[s]." *Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys. Inc.*, 180 F.3d 1072, 1079 (9th Cir. 1999). Thus, this factor weighs heavily in favor of viewers (and, therefore, Dish).

### b.    *Broadcast Works Are Public in Nature.*

The second fair use factor likewise favors viewers because the works in question are made widely available, and they are broadcast over the air for the public to watch free of charge. "[T]ime-shifting merely enables a viewer to see such a work which he had been invited to witness in its entirety free of charge." *Sony*, 464 U.S. at 449. When works are broadly disseminated to the public, users' fair use rights are stronger. *Cf. Harper & Row Publishers, Inc. v. Nation Enters*., 471 U.S. 539, 564 (1985) (finding that fair use rights are stronger for published works than for unpublished).

15

Because Fox, like all broadcasters, is "granted the free and exclusive use of a limited and valuable part of the public domain," *Office of Commc'n of United Church of Christ v. FCC*, 359 F.2d 994, 1003 (D.C. Cir. 1966), when Fox "accepts that franchise [it] is burdened by enforceable public obligations." *Id.* As the Supreme Court has found, "to the extent time-shifting expands public access to freely broadcast television programs, it yields societal benefits." *Sony*, 464 U.S. at 454. This use, said the Court, "is consistent with the First Amendment policy of providing the fullest possible access to information through the public airwaves." *Sony*, 464 U.S. at 425 (quoting *Universal City Studios, Inc. v. Sony Corp. of Am.*, 480 F. Supp. 429, 454 (C.D. Cal 1979)). Because Fox is charged with promoting the public interest, which time-shifting also promotes, this prong of the fair use analysis favors its viewers.

### c.    *Time-Shifting Requires the Whole Work to Be Copied.*

To time-shift, viewers record programs in their entirety. The Supreme Court recognizes that "the extent of permissible copying varies with the purpose and character of the use," *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586-87 (1994). Here, as in *Sony*, the reproduction of an entire work "does not have its ordinary effect of militating against a finding of fair use," *Sony*, 464 U.S. at 449-50, because time-shifting is a noncommercial use of broadcast programming that is made freely available.

16

Put another way, the third fair use factor considers whether a person copies more of a work than is necessary for her purpose. *Harper & Row*, 471 U.S. at 564-65. Because the fair use of time-shifting requires making copies of the work as a whole, this factor does not favor Fox.

### d.    There Is No Effect on Any Likely Markets.

Fox makes much of the language in *Sony* that suggests that if a particular use "should become widespread" and "adversely affect the potential market for the copyrighted work," it might not be fair, based on § 107(4). Fox Br. 49 (citing *Sony*, 464 U.S. at 451). But the Court in *Sony* was well aware that some users might use time-shifting to bypass commercials. *Sony*, 464 U.S. at 423 ("The pause button . . . enabl[es] a viewer to omit a commercial advertisement from the recording . . .. The fast-forward control enables the viewer of a previously recorded program to run the tape rapidly when a segment he or she does not desire to see is being played back on the television screen."). The Court found time-shifting fair nonetheless. A fair use is fair regardless of whether it becomes widespread, and Fox's attempt to get rid of fair use when it becomes too convenient must fail.

Fox, like the plaintiffs in *Sony*, cannot show that time-shifting, even with commercial-skipping, causes cognizable harm. Since home recording is a noncommercial activity, Fox must show through "a preponderance of the evidence that *some* meaningful likelihood of future harm exists" because of its viewers'

actions. *Sony*, 464 U.S. at 451 (emphasis in original). But the evidence Dish presents refutes the broadcasters' case, showing that time-shifting in fact benefits copyright holders. In any case, a traditional video-on-demand service and time-shifting are not the same thing: time-shifting allows users to watch recently-aired shows that they might not have been able to watch live. Video-on-demand services, by contrast, offer access to a comprehensive back catalog of movies, entire runs of television series, and more. By creating a false equivalence between video-on-demand and time-shifting, Fox is attempting to show harm where there is none.

Even if Fox does plan to offer some new service that emulates time-shifting, it cannot show harm to a "traditional, reasonable, or likely to be developed" market for over-the-air broadcast programming. *Am. Geophysical Union v. Texaco, Inc.,* 60 F.3d 913, 930 (2d Cir. 1994). A copyright holder may not postulate harm to a hypothetical market where it sells to consumers the right to do things they now enjoy for free, such as the right to record programming. As the Second Circuit observed in *Texaco*,

> [A] copyright holder can *always* assert some degree of adverse affect on its potential licensing revenues as a consequence of the secondary use at issue simply because the copyright holder has not been paid a fee to permit that particular use. . . . Thus, were a court automatically to conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use, the fourth fair use factor would always favor the copyright holder.

60 F.3d 913, 929 n.17 (citations omitted) (emphasis in original).

18

As the Southern District Court of New York observed recently, "[a] copyright holder cannot preempt a transformative market."[3] *Authors Guild, Inc. v. HathiTrust,* 2012 U.S. Dist. LEXIS 146169, at *55 (S.D.N.Y. Oct. 10, 2012) (citing *Bill Graham Archives v. Dorling Kindersley Ltd*., 448 F.3d 605, 614-15 (2d Cir. 2006)). In that case, even though HathiTrust made complete copies of copyrighted literary works for the purpose of enabling full-text searching and disabled access, the Court found that its uses were transformative, did "not significantly impact a market," and were not unlawful. *Id.* at *55-58. Because of this, the Court disregarded claims by plaintiffs that HathiTrust's uses might "undermin[e] existing and emerging licensing opportunities." *Id.* at *55.

Similarly, in *Sarl Louis Feraud Int'l v. Viewfinder, Inc.*, 627 F. Supp. 2d 123, 136 (S.D.N.Y. 2008), plaintiff fashion designers alleged that press photographers interfered with a yet-undeveloped market for photographs from the designers themselves. But this Court found that fashion designers "have never operated as suppliers for such a market." *Id*. As in *Viewfinder*, while "[o]ne could imagine an

---

[3] Whether harm comes to a traditional or a hypothetical market is a fourth factor consideration, even though discussion of this point sometimes involves discussion of the first-factor consideration of whether a use is transformative. It is not necessary that a use is transformative to find that it belongs to a transformative market. In this case, time-shifting is a transformative use because it enables ways of viewing a program that are wholly different than watching it live over-the-air. Even if this Court finds that it is not a transformative use, time-shifting is part of a transformative market because broadcasters do not traditionally sell viewers the right to record programming and watch it at other times.

alternate reality" where viewers were eager to pay new fees to Fox for the right to time-shift programming, simply postulating a "far-fetched" new market is not enough to show harm under the fourth factor of a fair use analysis. *Id.*

Because Fox's viewers are not liable for direct copyright infringement, Dish cannot be secondarily liable. That is the right result not just for Dish but for the public. Fox's argument that time-shifting and watching a program commercial-free constitutes infringement cannot be limited to the Hopper. Rather, under Fox's theory, millions of Americans, whether they subscribe to Comcast or Time Warner Cable, Dish or DirecTV, or whether they simply watch TV broadcast over the air, commit copyright infringement each and every time they time-shift programming and skip commercials by fast-forwarding. But "[o]ne may search the Copyright Act in vain for any sign that the elected representatives of the millions of people who watch television every day have made it unlawful to copy a program for later viewing at home . . . ." *Sony*, 464 U.S. at 456.

### 2. The Hopper's Time-Shifting Does Not Allow Users to Create "Libraries."

Hoping to avoid the clear precedent of *Sony*, Fox misleadingly describes the Hopper as creating a "library" of programming and insists that this advanced functionality "goes far beyond" what VCRs were capable of when *Sony* was decided. Fox Br. 44. But the Hopper does not, as Fox contends, create a "library" of shows. It creates temporary copies of programming, not a permanent library.

The only purpose of the copies is to enable viewers to time-shift their viewing in exactly the same way they would do had they manually recorded a given show. In fact, unlike shows recorded on a standard DVR, the Hopper *automatically deletes* PTAT programs after a few days.

Similarly strained is Fox's effort to define legal time-shifting as "the practice of recording a program to view it once at a later time, and thereafter erasing it." Fox Br. 44-45 (citing *Sony*, 464 U.S. at 423). As shown by the Supreme Court's full opinion, and later cases, the principles articulated in *Sony* have wide applicability and are not limited to what was possible with cassette tapes and analog broadcasts. *Sony*, 464 U.S. at 448 n. 31 ("'[Section 107] endorses the purpose and general scope of the judicial doctrine of fair use, but there is no disposition to freeze the doctrine in the statute, especially during a period of rapid technological change.'" (quoting H.R. Rep. No. 94-1476, p. 65-66 (1976), U.S. Code Cong. & Admin. News 1976, p. 5680)); *see also Perfect 10*, 508 F. 3d at 1146 ("[W]e note the importance of analyzing fair use flexibly in light of new circumstances.").

The Hopper serves the same purpose as VCRs and DVRs: to allow viewers to watch programming after it airs at a time convenient for them. The Hopper simply makes the process even more convenient, by enabling viewers to automatically record some programming instead of manually selecting particular

shows or channels. While the Hopper may go beyond Fox's cramped definition of time-shifting, so do most DVRs, which do not delete programs after a single viewing. If Fox's proposed interpretation of time-shifting carries the day then all major subscription television systems that provide DVRs – Comcast, Time Warner Cable, Verizon, DirecTV, and others – are secondary copyright infringers, and *their subscribers are infringers even if they do not skip past commercials at all*. The law does not require this and sound policy abhors it.

### 3. The Hopper's Commercial-Skipping Feature Does Not Implicate Copyright and Does Not Make Its Time-Shifting Unlawful.

The actual locus of Fox's objection to Hopper is the act of skipping commercials.[4] It complaints that "the copies likewise are not being made solely for the purpose of time-shifting but rather to watch without commercials." Fox Br. 46. This makes no sense. Viewers are time-shifting regardless of the manner in which they watch the programming at a later time. Time-shifting does not stop being time-shifting if a viewer mutes the program, walks out during the second half, or skips past the commercials.

Fox's complaint does, however, surface a real issue in this case: whether copyright law allows broadcasters to control all the uses that viewers make of their

---

[4] *See* Cyrus Farivar, *Fox, NBCUniversal Sue Dish over Ad-Skipping DVR Service*, ARS TECHNICA (May 24, 2012), http://arstechnica.com/tech-policy/2012/05/fox-nbcuniversal-sue-dish-over-ad-skipping-dvr-service.

works. Of course, it does not. *Sony*, 464 U.S. at 432 (copyright "protection has never accorded the copyright owner complete control over all possible uses of his work"). Fox has the right to control the reproduction,[5] public performance, and initial distribution of its works, but it does not have the right to control their private consumption. A viewer can watch as much or as little of Fox's programming as she wishes, with the sound on or off, with commercials or without, on any screen. She may change the channel during the commercials, or overlay a show with a program guide. Whether Fox approves of these uses is immaterial, since its approval is not necessary.

### B.    Dish's Intermediate Copying is a Fair Use.

While Amici urge affirmation of the bulk of the district court's findings, the district court erred in concluding that Dish's intermediate copying of Fox's works for quality assurance (QA) purposes may not be fair. Order 21. This finding was based on a fundamental error of law because the district court wrongly assumed that Dish's intermediate copies "are not transformative because they do not alter their originals 'with new expression, meaning, or message.'" *Id.* at 20-21 (quoting

---

[5] While later actions (such as a viewer's skipping commercials, or the opposite) can have no bearing on whether a use which took place in the past (making a recording) was fair, the *intent* of the party making a use of a copyrighted work may have bearing on fair use analysis. *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985) (giving weight to the "intended purpose" of an act). In this case, however, any purported market effects arising from a viewer skipping commercials should be considered as part of the fourth fair use factor, which is discussed below.

*Campbell*, 510 U.S. at 579). Altering the original with new meaning is only *one* of the many ways a work can be transformative. Following *Sony*, numerous cases have found the purpose of the use of a work to be transformative and fair, even though the copied work itself is not altered. *See Perfect 10*, 508 F.3d at 1146 ("[E]ven making an exact copy of a work may be transformative so long as the copy serves a different function than the original work."); *Newport-Mesa Unified Sch. Dist. v. State of Calif. Dep't of Educ.*, 371 F. Supp. 2d 1170, 1177 (C.D. Cal. 2005) (copies of completed, copyrighted test protocols are transformative fair uses because they allow parents to monitor the quality of their children's education).

In this case, Dish's intermediate copying is fair use because quality assurance is a transformative use under the first fair use factor. As in *A.V. ex rel. Vanderhye v. iParadigms, LLC*, where defendants made uses of student papers for the purpose of "detecting and discouraging plagiarism" that were "completely unrelated to [their] expressive content," Dish is making functional copies of Fox's works in a way that does not substitute for their purpose as works of creative expression. 562 F.3d 630, 640 (4th Cir. 2009) *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 544 (6th Cir. 2004) (finding fair use where the code of a copyrighted computer program was used not as a computer program but as a password to unlock a device).

24

Further, the ultimate purpose of those copies is to assist another fair use, time-shifting. Courts have repeatedly held that copies that are made for the purpose of a lawful use should themselves be lawful, even when those copies are intermediate and not part of a final work. *See Sony Computer Entm't v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000) ("[I]ntermediate copying and use of Sony's copyrighted BIOS was a fair use for the purpose of gaining access to the unprotected elements of Sony's software."); *see also Sega Enter. Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1520-28 (9th Cir. 1992).

Thus, Fox has not shown a likelihood of success on the merits of its claim that intermediate copying is infringing. This Court should reverse the district court's finding of infringement regarding the quality assurance copies.

## C.   Any Harms That Fox Alleges Are Quantifiable, and Do Not Support a Preliminary Injunction.

An irreparable harm is one that cannot be remedied by damages or permanent injunction after a trial on the merits. *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010). There are no shortcuts: irreparable harm must be demonstrated, not presumed. *Flexible Lifeline Systems, Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th Cir. 2011). Moreover, speculative injury is not sufficient. *Caribbean Marine Services Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) ("A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must demonstrate immediate threatened injury as a

prerequisite to preliminary injunctive relief."). Further, Fox must show a "sufficient causal connection between irreparable harm to [plaintiff]'s business and [defendant's behavior.]" *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 982 (9th Cir. 2011). In short, irreparable harm requires the plaintiff to show that the court should impose a preliminary injunction because the plaintiff would be harmed in a way that, if allowed, cannot be repaired by any remedy at law. *Salinger*, 607 F.3d at 81.

This is a significant burden, and Fox does not meet it. Its alleged injury is purely economic, and, if it were to win at trial, Dish could redress that injury with money. Fox's allegations of harm reduce to this: loss of advertising and licensing revenue. Fox Br. 53-62. Fox could straightforwardly attach a number to that lost revenue. First, even if the Hopper deprived Fox of *all* advertising revenue with respect to Dish customers, it would be a straightforward matter for Fox to calculate what proportion of its advertising revenue is attributed to Dish viewers and produce a damages sum accordingly. That there may be a factual dispute as to an exact amount of damages does not make such damages "irreparable."[6]

---

[6] The Federal Trade Commission recently filed an amicus brief, and with the United States Patent and Trademark Office issued a policy statement, detailing the government's views on the law with respect to preliminary injunctions and FRAND patents (where the patentee has committed to license its patents to everyone on fair, reasonable, and non-discriminatory terms). Brief of Amicus Curiae Federal Trade Commission Supporting Neither Party in *Apple Inc. and NeXT Software, Inc. (formerly known as NeXT Computer, Inc.) v. Motorola Inc.*

Second, Fox claims that Dish "disrupts" its ability to distribute programs in video-on-demand and digital channels. But presumably Fox knows how much revenue it generates from those and similar channel and can use those figures to benchmark harms in this case. As the district court found, "[t]he fact that Fox has licensing agreements with other companies shows that copies of the Fox Programs have a market value that other companies already pay in exchange for the right to use the copies." Order 32.

Even if, as Fox alleges, Fox Br. 62, existing licensing agreements do not line up on all fours with the uses that Hopper users and Dish are making here, they provide guidance that Fox could use to calculate an upper bound for any harms it may suffer.

---

(now known as *Motorola Solutions, Inc.*) and *Motorola Mobility, Inc.*, United States Court of Appeals for the Federal Circuit, Case Nos. 2012-1548, 2012-1549 (filed Dec. 4, 2012); United States Department of Justice and United States Patent & Trademark Office, Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/Rand Commitments (Jan. 8, 2013). While the agencies recognize that parties disagree as to exactly how much one should pay the other – otherwise they never would have gone to court – they rightly observe that the existence of a FRAND commitment necessarily means that *some* dollar amount would suffice as damages. Thus, the agencies caution that preliminary injunctions should only be granted in FRAND cases in rare circumstances. By way of analogy here, even though it may be difficult at this stage to quantify damages, the existence of licensing markets and similar benchmarks shows that such damages are not inherently unquantifiable. Thus here, similarly to the FRAND cases considered by the agencies, there is no irreparable harm, and a preliminary injunction is inappropriate.

Fox puts forward a number of other harms arguments that are easily dismissed. It attempts to muddy the issue by speculating about what might happen if Dish's competitors adopt similar technology. Fox Br. 58-59. But of course, Dish's competitors are unlikely to do so until the Hopper has been found to be legal – and, once it has, Fox can hardly characterize these lawful uses of content as "harms." (And if the Hopper were *not* found to be legal, Dish could simply pay the damages flowing from its own infringements, which would be unlikely to be repeated by others.) Fox also repeatedly invokes "disruption" and "loss of control" as harms this Court should seek to remedy. Fox Br. 3, 6, 53, 56, 60-61. But whether Fox's existing business model can continue in perpetuity, regardless of technological change and consumer protection, is not a matter before this Court. As the district court found, even to the extent that these more abstract concerns are "harms" at all, Fox has not shown that they stem from any infringing behavior by Dish. Order 32.

## CONCLUSION

Copyright law does not grant copyright holders like Fox absolute control over the use of their works. The district court followed clear precedent and sound policy when it found that users of Dish's Ad Hopper do not trespass on Fox's exclusive rights, that Dish would not likely be liable for its customers' uses, and

that Fox suffered no irreparable harm. This Court should affirm the district court's order, but clarify that Dish's intermediate copying is a fair use.


Dated: January 24, 2013                    _____/s/ Mitchell L. Stoltz_____
                                           Mitchell L. Stoltz
                                           Corynne McSherry
                                           ELECTRONIC FRONTIER
                                           FOUNDATION
                                           454 Shotwell Street
                                           San Francisco, CA 94110
                                           Telephone: (415) 436-9333

                                           *Attorneys for Amici Curiae*

                                           *On the brief:*
                                           John Bergmayer
                                           Senior Staff Attorney
                                           PUBLIC KNOWLEDGE
                                           1818 N Street, NW, Suite 410
                                           Washington, DC 20036
                                           Telephone: (202) 861-0020
                                           john@publicknowledge.org

                                           *On the brief:*
                                           Betsy Rosenblatt
                                           ORGANIZATION FOR
                                           TRANSFORMATIVE WORKS
                                           2576 Broadway, Suite119
                                           New York, NY 10025
                                           betsy_rosenblatt@post.harvard.edu

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION,
## TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS
## PURSUANT TO FED. R. APP. P. 32(a)(7)(C)

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify as follows:

1.    This BRIEF AMICI CURIAE OF ELECTRONIC FRONTIER FOUNDATION, PUBLIC KNOWLEDGE, AND ORGANIZATION FOR TRANSFORMATIVE WORKS IN SUPPORT OF APPELLEES complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,937 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2011, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated: January 24, 2013

_____/s/ Mitchell L. Stoltz_____
Mitchell L. Stoltz
Corynne McSherry
ELECTRONIC FRONTIER
FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
Telephone: (415) 436-9333

*Attorneys for Amici Curiae*

30

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on January 24, 2013.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: January 24, 2013          _____/s/ Mitchell L. Stoltz_____
                                 Mitchell L. Stoltz
                                 Corynne McSherry
                                 ELECTRONIC FRONTIER
                                 FOUNDATION
                                 454 Shotwell Street
                                 San Francisco, CA 94110
                                 Telephone: (415) 436-9333

                                 *Attorneys for Amici Curiae*