**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

FOX BROADCASTING COMPANY,
INC.; TWENTIETH CENTURY FOX
FILM CORPORATION; FOX
TELEVISION HOLDINGS, INC.,
*Plaintiffs-Appellants*,

v.

DISH NETWORK L.L.C.; DISH
NETWORK CORPORATION,
*Defendants-Appellees*.

No. 12-57048

D.C. No.
2:12-cv-04529-
DMG-SH

OPINION

---

Appeal from the United States District Court
for the Central District of California
Dolly M. Gee, District Judge, Presiding

Argued and Submitted
June 4, 2013—Pasadena, California

Filed July 24, 2013

Before: Sidney R. Thomas, Barry G. Silverman,
and Raymond C. Fisher, Circuit Judges.

Opinion by Judge Thomas

2    FOX BROADCASTING CO. V. DISH NETWORK

## SUMMARY[*]

### Copyright / Preliminary Injunction

The panel affirmed the district court's denial of a broadcaster's request for a preliminary injunction against a pay television provider's products that skipped over commercials.

The panel held that the district court did not abuse its discretion in holding that the broadcaster failed to demonstrate a likelihood of success on its copyright infringement and breach of contract claims regarding the television provider's implementation of the commercial-skipping products. As to a direct copyright infringement claim, the record did not establish that the provider, rather than its customers, made copies of television programs for viewing. The broadcaster did not establish a likelihood of success on its claim of secondary infringement because, although it established a prima facie case of direct infringement by customers, the television provider showed that it was likely to succeed on its affirmative defense that the customers' copying was a "fair use." Applying a "very deferential" standard of review, the panel concluded that the district court did not abuse its discretion in denying a preliminary injunction based on the alleged contract breaches.

The panel also held that the broadcaster failed to demonstrate a likelihood of irreparable harm from the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

provider's creation of television-show copies used to perfect the functioning of one of its commercial-skipping products.

## COUNSEL

Paul M. Smith (argued), Jenner & Block LLP, New York, New York; Richard L. Stone, Andrew J. Thomas, David R. Singer, and Amy M. Gallegos, Jenner & Block LLP, Los Angeles, California, for Plaintiffs-Appellants.

E. Joshua Rosenkranz (argued), Peter A. Bicks, Elyse D. Echtman, and Lisa T. Simpson, Orrick, Herrington & Sutcliffe LLP, New York, New York; Annette L. Hurst and William A. Molinski, Orrick, Herrington & Sutcliffe LLP, San Francisco, California; Mark A. Lemley and Michael H. Page, Durie Tangri LLP, San Francisco, California, for Defendants-Appellees.

Robert A. Long, Jennifer A. Johnson, and David M. Zionts, Covington & Burling LLP, Washington, D.C., for Amici Curiae ABC Television Affiliates Association et al.

Jeffrey A. Lamken and Robert K. Kry, MoloLamken LLP, Washington, D.C., for Amicus Curiae Cablevision Systems Corp.

Mark J. Prak, Charles F. Marshall, Julia C. Ambrose, and Laura S. Chipman, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Raleigh, North Carolina; Jane E. Mago, Jerianne Timmerman, Bart Stringham, and Benjamin F. P. Ivins, National Association of Broadcasters, Washington, D.C., for Amicus Curiae National Association of Broadcasters.

Kelly M. Klaus and Jonathan H. Blavin, Munger, Tolles & Olson LLP, Los Angeles, California, for Amici Curiae Paramount Pictures Corp. et al.

Seth D. Greenstein and Robert S. Schwartz, Constantine Cannon LLP, Washington, D.C., for Amici Curiae Computer & Communications Industry Association et al.

Mitchell L. Stoltz and Corynne McSherry, Electronic Frontier Foundation, San Francisco, California; John Bergmayer, Public Knowledge, Washington, D.C.; Betsy Rosenblatt, Organization for Transformative Works, New York, New York, for Amici Curiae Electronic Frontier Foundation et al.

Jason Schultz, Samuelson Law, Technology & Public Policy Clinic, University of California, Berkeley, School of Law, Berkeley, California, for Amici Curiae law scholars and professors.

## OPINION

THOMAS, Circuit Judge:

Dish Network offers two marsupial-inspired products: the "Hopper," which "hops" over commercials, and a companion box known as a "Joey." Fox Broadcasting Company claims these products are contractually out of bounds and constitute copyright infringement. The district court denied the broadcaster's request for a preliminary injunction. We have jurisdiction under 28 U.S.C. § 1292, and we affirm.

## I

Plaintiffs Fox Broadcasting Company, Twentieth Century Fox Film Corp., and Fox Television Holdings, Inc. (collectively, "Fox") own the copyrights to television shows that air on the Fox television network. Its primetime lineup includes shows such as *Glee*, *Bones*, *The Simpsons*, and *Family Guy*. Fox contracts with cable and satellite television service providers to retransmit Fox's broadcast signal for the customers of these providers, known as multichannel video programming distributors. Some such distributors also offer Fox programming via video on demand. Fox separately licenses its shows to companies such as Hulu, Apple, Netflix, and Amazon, which sell Fox programs online or stream them over the Internet.

One distributor that Fox contracts with is Dish Network, the third-largest pay television service provider in the United States. Dish retransmits Fox's broadcast signal under a 2002 contract with Dish's former parent company and current technology vendor, EchoStar Technologies. Among other things, the contract provides that Dish shall not "distribute" Fox programs on an "interactive, time-delayed, video-on-demand or similar basis," though Dish may "connect[] its Subscribers' video replay equipment." Dish also cannot "record, copy, duplicate and/or authorize the recording, copying, duplication (other than by consumers for private home use) or retransmission" of any part of Fox's signal.

Fox and Dish have amended this contract several times, most recently in a 2010 letter agreement. Under that agreement, Dish could provide Fox Video On Demand to its subscribers, but Dish had to "disable fast forward functionality during all advertisements"; the contract stated

"such fast-forward disabling is a necessary condition to distribution of the Fox broadcast content via [video on demand]." The 2010 agreement also forbids Fox and Dish from attempting to "frustrate or circumvent" the contractual rights.

In March 2012, Dish released to its customers the Hopper, a set-top box with digital video recorder (DVR) and video on demand capabilities. The Hopper provides service to up to four televisions in a home using companion boxes (known as Joeys) wired to each television. Dish customers can also watch Hopper content on their computers and mobile devices using a product called the Sling Adapter.

At the same time it released the Hopper, Dish introduced a feature called PrimeTime Anytime that works only on the Hopper. PrimeTime Anytime allows a subscriber to set a single timer to record any and all primetime programming on the four major broadcast networks (including Fox) every night of the week. To enable PrimeTime Anytime, a Hopper user presses the "*" button on the remote control to reach the PrimeTime Anytime setup screen. The user selects "Enable," and a new menu appears where the viewer can disable recordings of certain networks on certain days of the week and change the length of time that the shows are saved (between two and eight days). By default, PrimeTime Anytime records primetime shows on all four networks each night of the week and saves all recordings for eight days.[1]

---

[1] Prior to July 2012, a viewer who enabled PrimeTime Anytime could not deselect any networks or days of the week, and could not save recordings for fewer than eight days. The district court "examine[d] the propriety of the Hopper features in their current form, as Dish has stated that it has no plans to return to its pre-July 20, 2012 practices." *Fox*

FOX BROADCASTING CO. v. DISH NETWORK        7

Dish determines the start and end time of the PrimeTime Anytime recordings each night and sometimes alters these times to record programming outside the traditional primetime window of 8 p.m. to 11 p.m. Eastern and Pacific time Monday through Saturday and 7 p.m. to 11 p.m. on Sunday  (Primetime starts and ends one hour earlier in the Mountain and Central time zones.).  For instance, Dish altered the times to accommodate Olympic programming on NBC in summer 2012.  If at least half of a program falls within the primetime window, Dish includes the entire show in the PrimeTime Anytime recording.

A user may start watching recorded programs immediately after PrimeTime Anytime starts recording.  The user must enable PrimeTime Anytime at least 15 minutes before the primetime recording begins and can cancel a PrimeTime Anytime recording up to 15 minutes before the recording begins; after that, a user can no longer cancel that day's PrimeTime Anytime recording.

All PrimeTime Anytime recordings are stored locally on a customer's Hopper for the preselected number of days (typically eight), at which time they are automatically deleted.  Before that time, a customer cannot actually delete or save a PrimeTime Anytime recording.  Rather, if the customer selects "Save" or "Save Series" from the PrimeTime Anytime menu, an icon is created in the customer's "My Recordings" folder, but the icon is simply linked to the PrimeTime Anytime recording until the time of automatic deletion, at which time a duplicate copy is created.  Similarly, if a customer "deletes" a show recorded through

---

*Broad. Co. v. Dish Network, LLC*, 905 F. Supp. 2d 1088, 1094 n.6 (C.D. Cal. 2012).

PrimeTime Anytime, the icon for that show disappears from the user's graphical user interface, but the recording remains on the customer's hard drive until it is automatically deleted.

Dish customers can also use the Hopper to access pay-per-view movies via video on demand, but Dish does not offer video on demand from any of the four broadcast networks, including Fox. Video on demand recordings are stored on the user's hard drive in a file directory separate from the PrimeTime Anytime and DVR recordings.

In May 2012, Dish started offering a new feature, AutoHop, that allows users to automatically skip commercials. AutoHop is only available on shows recorded using PrimeTime Anytime, typically on the morning after the live broadcast. It is not available for all primetime programs. When a user plays back a PrimeTime Anytime recording, if AutoHop is available, a pop-up screen appears that allows the user to select the option to "automatically skip over" commercial breaks. By default, AutoHop is not selected.

If a customer enables AutoHop, the viewer sees only the first and last few seconds of each commercial break. A red kangaroo icon appears in the corner of the screen to demonstrate that AutoHop is skipping commercials. Unlike the 30-second skip feature available on many DVRs, once a user has enabled AutoHop, the user does not press anything to skip through commercials. AutoHop does not delete commercials from the recording. Customers can see the commercials if they manually rewind or fast-forward into a commercial break.

To create the AutoHop functionality, Dish technicians in Cheyenne, Wyoming manually view Fox's primetime

programing each night and technologically mark the beginning and end of each commercial. The program content is not altered in any way. The electronically marked files are then uplinked in Wyoming and eventually transmitted to subscribers in an "announcement" file that Dish makes available to subscribers after the show has aired. Simultaneously with the uplink, three "beta Hoppers" record the Fox primetime block for transmissions in Kentucky, Pennsylvania, and Florida to test the marking announcement. These copies remain at the uplink facility and are used to make sure the commercials have been accurately marked and that no portion of the program has been cut off.

Fox sued Dish for copyright infringement and breach of contract and sought a preliminary injunction. The district court denied the motion. *Fox Broad. Co. v. Dish Network, LLC*, 905 F. Supp. 2d 1088 (C.D. Cal. 2012). It held that Fox did not demonstrate a likelihood of success on most of its copyright infringement and contract claims. The exceptions were Fox's claims regarding the quality assurance copies. In making these copies, the court held, Dish likely breached its contract with Fox and directly infringed Fox's reproduction rights. *Id.* at 1102–06, 1108. Nonetheless, the court held that Fox was not entitled to an injunction because it failed to establish that it would likely suffer "irreparable harm" as a result of those copies. *Id.* at 1109–11.

To obtain a preliminary injunction, Fox must demonstrate that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an

injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).[2]

We review the denial of a preliminary injunction for an abuse of discretion. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1157 (9th Cir. 2007). Factual findings are reviewed for clear error, and legal conclusions are reviewed de novo. *Id.* We do not reverse "simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 752 (9th Cir. 1982); *see also United States v. Hinkson*, 585 F.3d 1247, 1261–62 (9th Cir. 2009) (en banc).

Applying this deferential standard of review, we hold that the district court did not abuse its discretion in holding that Fox did not demonstrate a likelihood of success on its copyright infringement and breach of contract claims regarding Dish's implementation of PrimeTime Anytime and AutoHop. Furthermore, the district court did not err in holding that Fox did not demonstrate a likelihood of irreparable harm from Dish's creation of the "quality assurance" copies used to perfect the functioning of AutoHop.

---

[2] Alternatively, a plaintiff may obtain an injunction if it demonstrates (1) serious questions going to the merits, (2) a balance of hardships that tips sharply towards the plaintiff, (3) a likelihood of irreparable injury, and (4) the injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Because Fox does not argue that the balance of hardships tips sharply in its favor, we do not consider its claims under this standard.

## II

### A

The district court did not abuse its discretion in holding that Fox was unlikely to succeed on its claim of direct copyright infringement regarding PrimeTime Anytime. "To establish a claim of copyright infringement by reproduction, the plaintiff must show ownership of the copyright and copying by the defendant." *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 817 (9th Cir. 2003); *see also* 17 U.S.C. §§ 106(1), 501(a).

In this case, the district court determined that Fox had demonstrated ownership of the copyrights of some of the shows. The court then focused on who made the copies of Fox programs using PrimeTime Anytime: Dish or its customers. The district court noted that the Second Circuit had considered a similar question in *Cartoon Network LP v. CSC Holdings, Inc. ("Cablevision")*, 536 F.3d 121 (2d Cir. 2008). The Second Circuit concluded that Cablevision's remote-storage DVR system did not directly infringe the plaintiffs' copyrights. Unlike a typical DVR system, in which a customer's remote sends signals to the set-top box in her home, users of Cablevision's remote-storage DVR system sent signals to Cablevision's central facility, where a copy of the program the viewer selected was created and stored on Cablevision's central servers. *Id.* at 125, 130. The question was "*who* made this copy" – the viewer or Cablevision? *Id.* at 130. The Second Circuit held that much like a VCR user makes the copy, so did the Cablevision customer. *Id.* at 131.

In this case, the district court found that "Dish exercises a degree of discretion over the copying process beyond that

12    FOX BROADCASTING CO. V. DISH NETWORK

which was present in *Cablevision*." *Fox Broad.*, 905 F. Supp. 2d at 1102. It pointed to the facts that Dish decides how long copies are available for viewing, Dish maintains the authority to modify the start and end times of the primetime block, and a user cannot stop a copy from being made once the recording has started. *Id.* at 1101–02. Yet the court held that "at this stage of the proceedings," it was "not satisfied" that PrimeTime Anytime had "crossed over the line that leads to direct liability." *Id.* at 1102. The court held that the "user, not Dish, must take the initial step of enabling" PrimeTime Anytime. *Id.* "The user, then, and not Dish, is 'the most significant and important cause' of the copy." *Id.* (quoting Prosser & Keeton on Torts § 42).

The district court did not abuse its discretion in concluding that Fox had not established a likelihood of success on this claim. Infringement of the reproduction right requires "copying *by* the defendant," *Kelly*, 336 F.3d at 817 (emphasis added), which comprises a requirement that the defendant cause the copying. *See Cablevision*, 536 F.3d at 130 (explaining that direct infringement claim turned on "*who* made" the copies). Fox argues that because Dish participates in the operation of PrimeTime Anytime on a daily basis, Dish made the copies, either alone or concurrently with its users. However, operating a system used to make copies at the user's command does not mean that the system operator, rather than the user, caused copies to be made. Here, Dish's program creates the copy only in response to the user's command. Therefore, the district court did not err in concluding that the user, not Dish, makes the copy.

That Dish decides how long copies are available for viewing, modifies the start and end times of the primetime block, and prevents a user from stopping a recording might be

FOX BROADCASTING CO. V. DISH NETWORK        13

relevant to a secondary or perhaps even a direct infringement claim. *Cf. Cablevision*, 536 F.3d at 132–33 (finding that factors evidencing Cablevision's control over copying process seemed "more relevant to the question of contributory liability" but reserving the question "whether one's contribution to the creation of an infringing copy may be so great that it warrants holding that party directly liable for the infringement, even though another party has actually made the copy"). But these facts do not establish that Dish made the copies. Therefore, the district court did not err in holding that Fox did not establish a likelihood of success on its direct infringement claim.

**B**

The district court did not abuse its discretion in concluding that Fox was unlikely to succeed on its claim of secondary copyright infringement for the PrimeTime Anytime and AutoHop programs. "Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 n.2 (9th Cir. 2001). Therefore, to establish secondary liability, Fox must establish that Dish's users are infringing. There is no dispute that Fox has established a *prima facie* case of direct infringement by Dish customers because Fox owns the copyrights to its shows and the users make copies. Thus, the burden shifts to Dish to demonstrate that it is likely to succeed on its affirmative defense that its customers' copying was a "fair use." *Perfect 10*, 508 F.3d at 1158. Dish has met this burden.

As the district court recognized, the Supreme Court's analysis in *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), provides strong guidance in assessing

whether Dish customers' copying of Fox programs is a "fair use."  In *Sony*, the Supreme Court held that Sony was not liable for secondary infringement for manufacturing Betamax VCRs because customers used the machines primarily for time-shifting, "the practice of recording a program to view it once at a later time, and thereafter erasing it."  *Id.* at 423.  The Court held that "even the unauthorized home time-shifting of respondents' programs is legitimate fair use."  *Id.* at 442.

Fox and its *amici* argue that Dish customers use PrimeTime Anytime and AutoHop for purposes other than time-shifting – namely, commercial-skipping and library-building.  These uses were briefly discussed in *Sony*, in which the Court recognized that some Betamax customers used the device to avoid viewing advertisements and accumulate libraries of tapes.  In *Sony*, about 25 percent of Betamax users fast-forwarded through commercials.  *Id.* at 452 n.36.  Additionally, a "substantial number of interviewees had accumulated libraries of tapes."  *Id.* at 423.  One user owned about 100 tapes and bought his Betamax intending to "build a library of cassettes," but this "proved too expensive."  *Id.* at 423 n.3.  Because the Betamax was primarily used for time-shifting, the Court in *Sony* never expressly decided whether commercial-skipping and library-building were fair uses.  *Cf. Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 931 (2005) (explaining that "[a]lthough Sony's advertisements urged consumers to buy the VCR to 'record favorite shows' or 'build a library' of recorded programs, neither of these uses was necessarily infringing" (citations omitted)).

Yet, as the district court held, commercial-skipping does not implicate Fox's copyright interest because Fox owns the copyrights to the television programs, not to the ads aired in

the commercial breaks. If recording an entire copyrighted program is a fair use, the fact that viewers do not watch the ads not copyrighted by Fox cannot transform the recording into a copyright violation. Indeed, a recording made with PrimeTime Anytime still includes commercials; AutoHop simply skips those recorded commercials unless a viewer manually rewinds or fast-forwards into a commercial break. Thus, any analysis of the market harm should exclude consideration of AutoHop because ad-skipping does not implicate Fox's copyright interests.

Analyzing PrimeTime Anytime under the fair use factors, Dish has demonstrated a likelihood of success on its customers' fair use defense. As for the first factor, the "purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes," 17 U.S.C. § 107(1), Dish customers' home viewing is noncommercial under *Sony*, which held that "time-shifting for private home use" was a "noncommercial, nonprofit activity," 464 U.S. at 449. Here, the district court found that PrimeTime Anytime is used for time-shifting, and that the Hopper is available only to private consumers. *Fox Broad.*, 905 F. Supp. 2d at 1098.

*Sony* also governs the analysis of the second and third factors, the "nature of the copyrighted work" and "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," 17 U.S.C. §§ 107(2), (3). *Sony* held that "when one considers the nature of a televised copyrighted audiovisual work, and that time-shifting merely enables a viewer to see such a work which he had been invited to witness in its entirety free of charge, the fact that the entire work is reproduced, does not have its ordinary effect of militating against a finding of fair use." 464 U.S. at

449–50 (citations omitted). The same analysis applies here, and thus the fact that Dish users copy Fox's entire copyrighted broadcasts does not have its ordinary effect of militating against a finding of fair use.

Finally, we consider the "effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This is the "most important element of fair use." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985). Because Dish customers' taping is "for a noncommercial purpose," the likelihood of future market harm is not presumed but "must be demonstrated." *Sony*, 464 U.S. at 451. Fox "need only show that if the challenged use 'should become widespread, it would adversely affect the *potential* market for the copyrighted work.'" *Harper & Row*, 471 U.S. at 568 (quoting *Sony*, 464 U.S. at 451 (emphasis added by *Harper & Row* Court)).

Because Fox licenses its programs to distributors such as Hulu and Apple, the market harm analysis is somewhat different than in *Sony*, where no such secondary market existed for the copyright-holders' programs.[3] However, the record before the district court establishes that the market harm that Fox and its *amici* allege results from the automatic commercial-skipping, not the recording of programs through PrimeTime Anytime. Indeed, Fox often charges no additional license fees for providers to offer Fox's licensed video on demand, so long as providers disable fast-forwarding. This indicates that the ease of skipping commercials, rather than the on-demand availability of Fox programs, causes any

---

[3] Instead, the *Sony* plaintiffs argued in part that the Betamax would reduce the audience for live television and movies, a fear the district court described as lacking "factual basis." 464 U.S. at 453.

market harm. And as we have discussed, the commercial-skipping does not implicate any copyright interest.

In arguing otherwise, Fox points to the district court's market harm analysis in a different section of its opinion. However, that analysis is not relevant to determining whether PrimeTime Anytime causes market harm because that portion of the opinion addresses a different question: whether the "quality assurance" copies used to test AutoHop would harm the market for Fox to license copies of its shows. Because the quality assurance copies were used to perfect AutoHop, the district court assessed whether AutoHop caused market harm and found that Dish "harms Fox's opportunity to negotiate a value for [authorized] copies and also inhibits Fox's ability to enter into similar licensing agreements with others in the future by making the copies less valuable." *Fox Broad.*, 905 F. Supp. 2d at 1105. However, the court's analysis of the market harm caused by the quality assurance copies does not affect the assessment of whether Dish customers' copying of programs potentially causes market harm because the district court correctly found that AutoHop, standing alone, does not infringe.

Therefore, the district court did not abuse its discretion in concluding that Fox was unlikely to succeed on its secondary infringement claim.

### C

The question of whether Dish has breached its contract with Fox is much closer. However, applying our very deferential standard of review, we conclude that the district court did not abuse its discretion in denying a preliminary injunction based on the alleged contract breaches.

18    FOX BROADCASTING CO. V. DISH NETWORK

Fox first argues that Dish breached the portion of the 2002 contract that states:

> EchoStar [now Dish] shall not, for pay or otherwise, record, copy, duplicate and/or authorize the recording, copying, duplication (other than by consumers for private home use) or retransmission of any portion of any Station's Analog Signal without prior written permission of the Station, except as is specifically permitted by this Agreement.

Fox's argument as to why Dish allegedly breached this clause is the same as its argument that Dish directly infringed its copyrights. It does not argue that the contract's use of "record, copy, duplicate" has a different meaning than the Copyright Act's definition of "reproduce." Given that Dish did not directly infringe Fox's copyrights, the district court properly concluded that Fox is unlikely to succeed on its claim that Dish breached this clause.

Second, Fox argues that Dish breached the following provision in the 2002 contract:

> EchoStar acknowledges and agrees that it shall have no right to distribute all or any portion of the programming contained in any Analog Signal on an interactive, time-delayed, video-on-demand or similar basis; *provided* that Fox acknowledges that the foregoing shall not restrict EchoStar's practice of connecting its Subscribers' video replay equipment . . . .

The district court construed the contract term "distribute" to be analogous to the same word in the Copyright Act, 17 U.S.C. § 106(3).  It held that distribution under the Copyright Act required a copyrighted work to "chang[e] hands," *Fox Broad.*, 905 F. Supp. 2d at 1106, and Dish engaged in no distribution because the PrimeTime Anytime copies "are made by users, remain in private homes, and do not change hands," *id.* at 1107.  Therefore, it held, Fox was unlikely to prevail on its claim that Dish breached this contract provision.[4]

On appeal, Fox challenges this construction of "distribute," essentially arguing that the prohibition against "distribut[ing]" Fox programming constitutes an agreement that Dish would not make Fox programming available to its subscribers.  Fox's interpretation is plausible, but so is the district court's.  While the district court would not be justified in holding that the meaning of the term "distribute" was unambiguous or that, as a matter of law, any ambiguous terms in the contract should be interpreted by looking to the Copyright Act, we do not read the district court's opinion as resting its decision on such grounds.  In the proceedings below, the parties did not argue about the meaning of "distribute."  Absent any argument or extrinsic evidence on this term, the district court did not err by looking to the Copyright Act to interpret "distribute."  We express no view on whether, after a fully developed record and arguments, the

---

[4] Fox also argued below that Dish violated its right "to distribute copies . . . of the copyrighted work to the public" under 17 U.S.C. § 106(3).  The district court held that Fox was unlikely to succeed on this claim. *Fox Broad.*, 905 F. Supp. 2d at 1106.  Fox has not challenged this ruling on appeal.

district court's construction of "distribute" will prove to be the correct one.

We are, however, dubious of Dish's position that PrimeTime Anytime is not "similar" to "interactive, time-delayed, [or] video-on-demand" programming, the distribution of which is expressly prohibited by the 2002 contract. Dish has convinced us that PrimeTime Anytime is not *identical* to video-on-demand but is at a loss to explain why it is not *similar*, and at oral argument, when pressed, Dish could not provide even a single example of what *would* be considered similar under the contract if not this. The contract is written broadly, and Fox has a good argument that PrimeTime Anytime is "similar," even though not exactly the same, as time-delayed or video-on-demand programming.

Third, Fox argues that Dish breached a provision of a 2010 letter agreement that modified the 2002 contract. The letter agreement permitted Dish to offer Fox's licensed video on demand (VOD) service so long as Dish disabled fast-forwarding during commercials:

> *DISH will disable fast forward functionality during all advertisements*; FBC and DISH may include a pre-roll announcement prior to each show regarding the fast-forward disabling. DISH and FBC will discuss in good faith the timing of DISH's implementation of such fast-forward disabling and messaging to consumers; *provided that DISH acknowledges and agrees that such fast-forward disabling is a necessary condition to distribution of the Fox*

FOX BROADCASTING CO. V. DISH NETWORK        21

*broadcast content via VOD*.    (Emphasis added.)

The district court held that if PrimeTime Anytime is video on demand, then Dish clearly breached the contract.  The court found this dispute "especially challenging because [PrimeTime Anytime] is, in some ways, a hybrid of DVR and VOD likely not contemplated by either party when the 2010 Agreement was drafted."  *Fox Broad.*, 905 F. Supp. 2d at 1109.  But the district court concluded that PrimeTime Anytime was "more akin" to DVR than to video on demand. *Id.*

Because the district court based its interpretation on extrinsic evidence, we review its holding for clear error. *Miller v. Safeco Title Ins. Co.*, 758 F.2d 364, 367 (9th Cir. 1985).  The district court's finding that PrimeTime Anytime was more akin to a DVR than to video on demand was not clearly erroneous.  Because, unlike the relevant clause of the 2002 contract, this provision of the 2010 letter agreement does not preclude Dish from enabling fast-forwarding on services that are "similar" to video on demand, the district court did not abuse its discretion in concluding that Fox was unlikely to succeed on its breach of contract claim.

The fact that a Dish attorney referred to PrimeTime Anytime as a "video-on-demand service" in a trademark application supports Fox's claim that the parties would have understood PrimeTime Anytime to be akin to video on demand.  Providing further support are Dish promotional materials that repeatedly referred to PrimeTime Anytime providing "On Demand access" or an "on demand library."  However, Dish introduced evidence that programming distributors such as itself and DirecTV have used the phrase

"on demand" to refer to DVR recordings, which are clearly not video on demand. And the district court relied in part on the fact that a viewer must enable PrimeTime Anytime before a show airs to view it later, which is an important feature distinguishing DVR from video on demand. *Fox. Broad.*, 905 F. Supp. 2d at 1109. Therefore, in light of the record before it, the district court did not clearly err in concluding that PrimeTime Anytime was more like DVR than video on demand.

Finally, Fox argues that Dish breached the portion of the 2010 letter agreement that provides that neither party may "take any action whatsoever intended to frustrate or circumvent, or attempt to frustrate or circumvent, the protections granted to the other Party pursuant to any provision in this Letter Agreement." Contrary to Fox's argument, the record does not indicate that Dish launched PrimeTime Anytime because it was unwilling to comply with the requirements to offer Fox's licensed video on demand service, rather than because Dish lacked the technological capability to do so. On this record, Fox has not demonstrated it is likely to succeed on this claim.

Therefore, the district court did not abuse its discretion in concluding that Fox did not demonstrate a likelihood of success on its breach of contract claims.

## III

The district court held that Dish likely directly infringed Fox's copyrights and breached the no-copying clause of the 2002 contract by making "quality assurance" copies to test the functioning of the AutoHop program. However, it ultimately concluded that Fox did not demonstrate a

likelihood of irreparable harm absent an injunction. Assuming, without deciding, that the district court correctly decided that Fox was likely to succeed on the merits of this claim, we agree with the district court that Fox did not demonstrate a likelihood of irreparable harm resulting from these copies.

These copies were made as part of Dish's process of implementing the AutoHop program. As we have noted, Dish creates marking announcements to signal to AutoHop when to skip commercials. It then tests the accuracy of the marking announcements using copies recorded through PrimeTime Anytime. These copies remain at a Dish facility and are used for "quality assurance" purposes only. A technician working for Dish then plays back each recording, enables AutoHop, and fast-forwards through each show segment just until the point of each commercial break to ensure AutoHop is working properly. If the marking announcements are correct, AutoHop is made available to Dish customers at 3 a.m. Eastern time on the morning following the live broadcast.

In refusing to enjoin Dish from creating these copies, the district court correctly concluded that the harms Fox identified – including "loss of control over its copyrighted works and loss of advertising revenue" – did not "flow from" the quality assurance copies themselves, but from the entire AutoHop program. *Fox Broad.*, 905 F. Supp. 2d at 1110–11. While a plaintiff need not "show that the action sought to be enjoined is the exclusive cause of the injury," *M.R. v. Dreyfus*, 697 F.3d 706, 728 (9th Cir. 2011), the district court did not err in concluding that the quality assurance copies were not a cause of Fox's alleged harm. That Dish used the copies in the process of implementing AutoHop does not

suggest that those copies were integral to AutoHop's functioning. Rather, the record demonstrates that the AutoHop announcement files are created using an entirely separate process and the quality assurance copies are used only to test whether this process is working.[5]

Furthermore, the district court did not err in holding that monetary damages could compensate Fox for its losses from the copies. *See, e.g.*, *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) ("[M]onetary injury is not normally considered irreparable."). To be sure, Fox does not license copies of its programs for distributors to create ad-skipping software. However, the lack of a licensing agreement that directly corresponds to Dish's copying of Fox programs does not mean it would be difficult to calculate damages. Fox's existing licensing agreements could, at the very least, constitute a starting point or an aid in calculating damages.

## IV

Given our "limited and deferential" review of preliminary injunction appeals, *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir.2003) (en banc) (per curiam), and without determining the ultimate merits of the case, *Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d

---

[5] Indeed, Dish has temporarily stopped making the quality assurance copies pending the outcome of this appeal.

1046, 1052 (9th Cir. 2009), we conclude that the district court did not abuse its discretion in declining to grant Fox a preliminary injunction.[6]

**AFFIRMED.**

---

[6] The parties' motions for judicial notice are **DENIED**.